ATTORNEY FOR APPELLANT
Daniel G. Pappas
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES
Richard L. Williams
Thomas C. Allen
Fort Wayne, Indiana

# In the
# Indiana Supreme Court



No. 02S05-0904-JV-146

IN THE MATTER OF THE
INVOLUNTARY TERMINATION OF THE
PARENT-CHILD RELATIONSHIP OF

J.M.,
      THE CHILD,

DANIEL G. PAPPAS, GUARDIAN AD
LITEM,

*Appellant (Defendant below)*,

v.

A.S., THE CHILD'S MOTHER,
A.M., THE CHILD'S ALLEGED
FATHER, THE UNKNOWN FATHER,
AND ALLEN COUNTY DEPARTMENT OF
CHILD SERVICES

*Appellees (Plaintiffs below).*

Appeal from the Allen Superior Court, No. 02D07-0707-JT-147
The Honorable Charles F. Pratt, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 02A05-0807-JV-416

**June 16, 2009**

**Sullivan, Justice.**

This is the second case that we have decided in recent weeks in which we have held that the involuntary termination of the parental rights of incarcerated parents was not warranted. See R.Y. v. Ind. Dep't of Child Servs., 904 N.E.2d 1257 (Ind. April 24, 2009). The fact that we have reached such a conclusion in such close proximity is coincidence and not a reflection of any presumption as to the outcome of such cases.[1]

In this case, J.M. was born to A.S. ("Mother") and A.M. ("Father") on November 1, 1999. Both parents had an ongoing relationship with J.M. during the first three years of his life and there are no allegations that during this period of time they were unfit parents in any way. In 2002, Mother and Father were convicted of Attempted Dealing in Methamphetamine. The trial court sentenced each to ten-year suspended sentences. Mother was incarcerated for three days and placed on ten years of probation. Father served two years in the Department of Correction and was placed on four years of work release and four years of probation. In 2002, J.M. was removed from Mother's care for 30 days but subsequently reunited with her.

In April, 2004, Mother and Father were again arrested and charged with Attempted Dealing in Methamphetamine and Conspiracy to Deal in Methamphetamine. Both pled guilty to Conspiracy to Deal in Methamphetamine as a Class B felony. Mother pled guilty to violating the terms of her probation and Father pled guilty to violation of his community corrections placement. The Montgomery Circuit Court entered a judgment of conviction and sentenced Mother to 20 years, with four years suspended to probation, i.e., 16 years of executed time. The trial court entered a judgment of conviction and sentenced Father to 12 years, with six years suspended to probation, i.e., 6 years of executed time.

Shortly after Mother's arrest, the Montgomery County office of the Indiana Department of Child Services ("State") removed J.M. from her care and placed him with his maternal grandmother and aunt in Vermillion County. He lived with them from June, 2004, to December,

---

[1] In point of fact, we have regularly denied transfer in cases where the Court of Appeals affirmed trial court orders terminating the parental rights of incarcerated parents. See In re C.T., 896 N.E.2d 571 (Ind. Ct. App. 2008), trans. denied; Everhart v. Scott County Office of Family & Children, 779 N.E.2d 1225 (Ind. Ct. App. 2002), trans. denied; Bailey v. Tippecanoe County Div. of Family & Children, 666 N.E.2d 73 (Ind. Ct. App. 1996), trans. denied; In re Wardship of J.C. v. Allen County Office of Family & Children, 646 N.E.2d 693 (Ind. Ct. App. 1995), trans. denied.

2004, and the court appointed them as J.M.'s guardians in November, 2004. The court dissolved the guardianship at the State's request in December, 2004, because the guardians "no longer wanted to care for [him]." (Tr. 82.) J.M. then lived in licensed foster care from December, 2004, to July, 2005, at which time he went to live with his paternal aunt and uncle in Allen County. They were appointed as his guardians in November, 2005. Following allegations of physical abuse, the State removed J.M. from the aunt and uncle's home in February, 2006, and placed him in licensed foster care, where he has since resided.

In March, 2006, the State filed a petition alleging that J.M. was a Child in Need of Services ("CHINS") because "his parents are unable to provide care for him due to their incarceration." (Appellant's App. 203.) In May, 2006, the Allen Superior Court, Family Relations Division, held a dispositional hearing where both parents admitted the allegations in the petition and the court found J.M. to be a CHINS. It thereafter issued a dispositional order directing that J.M. continue in licensed foster care and that both parents comply with the court's "Parent Participation Plan." Id. at 199-200. In December, 2006, after conducting a permanency hearing, the court established a "Permanency Plan" for J.M. that included termination of parental rights and adoption. Id. at 212.

On July 25, 2007, the State filed a "Mandatory Petition for Termination of Parent-Child Relationship (Involuntary)" between J.M. and his Mother and Father. Id. at 6. The court held a fact-finding hearing on January 8, 2008. On February 29, 2008, the court entered Findings of Fact and Conclusions of Law, denying the State's petition to terminate the parental rights of Mother and Father. It ordered J.M. "continued in licensed foster care as a ward of the [State]." Id. at 40. J.M.'s Guardian ad Litem ("GAL"), who participated in the fact-finding hearing, appealed,[2] contending that the State proved by clear and convincing evidence that the conditions that resulted in J.M.'s removal from his parents' care will not be remedied and that termination of his parents' parental rights is in J.M.'s best interests. The Court of Appeals agreed with the GAL, reversed the judgment of the trial court, and remanded with instructions to terminate the parental rights of Mother and Father. In re the Termination of the Parent-Child Relationship of

_____

[2] The GAL, Daniel G. Pappas, was a party of record in the trial court. We express our appreciation to Mr. Pappas for his obvious concern for the welfare of J.M. and the quality of his advocacy.

J.M., 895 N.E.2d 1228, 1237 (Ind. Ct. App. 2008).  Father filed a timely petition for rehearing, which the Court of Appeals denied.[3]

Both Mother and Father seek, and we grant, transfer, thereby vacating the opinion of the Court of Appeals.  Ind. Appellate Rule 58(A).

**Discussion**

**I**

Our recent opinion in R.Y. v. Ind. Dep't of Child Servs. sets forth at some length the relevant constitutional and statutory framework, as well as the burden of proof and standard of appellate review, governing proceedings to terminate parental rights.  904 N.E.2d at 1259-61. We will not repeat that discussion here; the interested reader is directed to that decision.

In this case, the trial court denied the State's petition to terminate parental rights based on its conclusion that the State failed to present clear and convincing evidence that the conditions which resulted in J.M.'s removal would not be remedied or that continuation of the parent-child relationship poses a threat to J.M.'s well-being.  The Court of Appeals reversed, finding the trial court's judgment to be "clearly erroneous."  In re J.M., 895 N.E.2d at 1236-37.  Mother and Father contend that the Court of Appeals erred by failing to apply the correct standard of review. More specifically, they argue that the Court of Appeals (1) failed to make the determination that the trial court's findings (regarding Mother and Father's dates of release from incarceration and their ability to provide a stable and appropriate life upon release) were clearly erroneous before

---

[3] Father petitioned the Court of Appeals to remand the case to the trial court "for further evidentiary proceedings regarding Father's current ability to provide a safe and stable environment for J.M. and the extent to which Father has remedied the conditions that led to J.M.'s removal from his care."  (Pet. for Reh'g on Behalf of [A.M.] at 3.)  He supported his petition with a "Motion to Supplement the Record." Although the CCS shows no ruling on the Father's motion, we find the information contained in it to be relevant to this appeal, grant the motion, and incorporate it into the record.

4

making its own contrary findings; and (2) failed to rely on the evidence most favorable to the trial court's judgment.[4]

## II

The trial court made written findings of fact concerning the parents' incarceration and their compliance with its previous orders. Based on these findings, the trial court concluded that "the parents' release dates are to occur soon. They have completed many of the required services under the dispositional decree while incarcerated. They had a relationship with the child prior to their imprisonment and attempted to keep the child in the care of relatives prior to their convictions. Their ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time. Thus, the child's need of permanency is not severely prejudiced." (Appellant's App. 40.)

We hold that this conclusion of the trial court is not clearly erroneous. We reach that result after examining the following four reasons that the trial court gave for concluding that there is a reasonable probability that the conditions which resulted in J.M.'s removal will be remedied and that continuation of the parent-child relationship does not pose a threat to J.M.'s well-being.

### A

We begin with the court's reason that Mother's and Father's "probable dates of release are close in time" and "are to occur soon." Their release dates are relevant and important because their incarceration is the condition that resulted in J.M.'s removal. The termination hearing in this matter occurred on January 8, 2008. Our review of the record indicates that

---

[4] Father makes two other contentions in his petition to transfer: (1) that "[t]he Appellate Court also improperly questioned [his] credibility with respect to has [sic] testimony regarding his future employment and housing" (Pet. to Transf. on Behalf of [A.M.] at 7, citing Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005)) and (2) that "[i]n light of the new evidence contained in Father's Motion to Supplement the Record and Petition for Rehearing, the Appellate Court erred in not modifying its remand order." Id. at 10. We address contention (1) in section II-D, n.7, infra. We find it unnecessary to address contention (2).

Mother testified at the termination hearing that her "projected earliest release date" was April, 2011. (Tr. 21.) Her "earliest possible release date", however, was April, 2009, if she completed her bachelor's degree. Id. at 34. She testified that she was "right on track" to complete her bachelor's degree in May, 2008, at which time she would be eligible for the Work Release Program. Id. Father testified at the termination hearing that his "projected earliest release date" was January, 2010. Id. at 41. He was "looking to get a year time cut here shortly and . . . be out at the latest January, 2009." Id. at 52. Father added that he had started a substance abuse program on the day of the termination hearing and that completion of the program would expedite his "out date" to July, 2008. Id.

This evidence from the record supports the trial court's finding that Mother's "official release date is in 2011. However, if she should complete her college degree then she will be eligible for work release in May, 2008." (Appellant's App. 39.) The evidence also supports the trial court's finding that Father's "earliest release date is July, 2008." Id. The trial court's findings in turn support its conclusions that Mother's and Father's "probable dates of release are close in time" and "are to occur soon." Id. at 40. The trial court's judgment based on these findings and conclusions is therefore not clearly erroneous,[5] contrary to the view of the Court of Appeals.[6]

**B**

Under the trial court's "Parent Participation Plan," Mother was ordered, in part, to enroll in and complete any available drug and/or alcohol programs, begin participation in weekly Narcotics Anonymous and/or Alcoholics Anonymous meetings, complete parenting classes, and

---

[5] See Bester, 839 N.E.2d at 147 ("A judgment is 'clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment.'" (quotation omitted)).

[6] The Court of Appeals made contrary findings that "[1] Mother's earliest release date is not until April of 2011. Granted, Mother could possibly be released as early as April of 2009; that release date, however, is contingent on Mother completing her college courses. [2] Father's release date is January of 2010." In re J.M., 895 N.E.2d at 1236. It concluded from these findings that "[g]iven that the earliest guaranteed release date for either parent is January of 2010, J.M. would have to remain in foster care for two more years from the date of the hearing, pending Father's release." Id. This conclusion was contrary to Bester because it was not limited to "only the evidence and reasonable inferences that are most favorable to the judgment." 839 N.E.2d at 147.

6

complete college and vocational courses.  (Appellant's App. 199.)  The trial court concluded that "[t]he parents have fully cooperated with the services required of them while incarcerated."  <u>Id.</u> at 39-40.  The Court of Appeals did not take issue with or otherwise dispute this conclusion and we see no basis for rejecting it as clearly erroneous.

**C**

The trial court concluded that Mother and Father "had a relationship with the child prior [to] their imprisonment and attempted to keep the child in the care of relatives prior to their convictions."  <u>Id.</u> at 40.  Again, the Court of Appeals did not take issue with or otherwise dispute this conclusion and we see no basis for rejecting it as clearly erroneous.

**D**

Lastly, we review the trial court's conclusion that Mother and Father's "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time.  Thus, the child's need of permanency is not severely prejudiced."  <u>Id.</u>  Our review of the record shows that Mother and Father have taken steps to provide permanency for J.M. upon their release.  In addition to completing all of the available required self-improvement programs ordered by the court's dispositional decree, Father testified at the termination hearing that after his release, "I have a job waiting on me . . . working excavation, running heavy machines."  (Tr. 50.)  He also had secured a home where Mother and J.M. could reside with him.  This testimony is corroborated by Father's "Motion to Supplement the Record," which we granted and incorporated into the record, <u>see</u> <u>supra</u> n.3.  The motion, supported by exhibits, states in relevant part that prior to his release from incarceration, Father had "obtained housing at Melrose Apartments and he currently reside [sic] at this housing complex in a clean and appropriate two bedroom apartment."  (Motion to Supplement the Record on Behalf of [A.M.] at 2 & Ex. 2.)  In addition, "[o]n November 10, 2008, Father began employment with Benny's Floor Coverings in Greencastle, Indiana as an installer.  He works 40 to 45 hours per week and has a $10.00 per hour rate of pay."  <u>Id.</u> at 3 & Ex. 4.  Finally, "[i]mmediately upon his release from Plainfield Correction Facility he purchased a 1981 Dodge

7

Ram truck for transportation, he registered the vehicle with the Bureau of Motor Vehicles and he obtained auto insurance through Progressive Southeastern Insurance Company." Id. at 2 & Ex. 3.

Mother testified at the termination hearing that she was "right on track" to complete her bachelor's degree in May, 2008, which would push her release date up to April, 2009. (Tr. 34.) At oral argument in May, 2009, the GAL acknowledged that Mother had been released from incarceration and her physical presence at oral argument was evidence that she had completed her bachelor's degree. In addition to her educational advancement, she testified at the termination hearing that she had completed a 16-month "community transition program . . . where we are offered a lot of different programs to help prepare us for re-entry into society." Id. at 37. Her testimony that she had not lined up a job or housing after her release is offset by evidence that Father has a stable job and appropriate housing for her and J.M.

The evidence from the record supports the trial court's conclusion that Mother and Father's "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time. Thus, the child's need of permanency is not severely prejudiced." Contrary to the view of the Court of Appeals, we see no basis for rejecting this conclusion as clearly erroneous.[7]

**Conclusion**

There was evidence in the record to support the trial court's findings, and these findings supported the trial court's judgment denying the State's petition to terminate the parental rights

---

[7] The Court of Appeals found that "[m]other has neither employment nor housing secured for after her release. Although Father testified that he has employment and housing secured, he could offer no proof of the specifics regarding his housing . . . Additionally, given that neither Mother nor Father has secured employment or housing, it is foreseeable that J.M. would have to remain in foster care until his parents could take on the responsibilities of parenthood; however, there is no guarantee that either parent will be able to care for J.M. following their release." In re J.M., 895 N.E.2d at 1236. Whether or not Father's testimony was credible and the weight to be given to it is a matter falling within the sound discretion of the trial court. See Bester, 839 N.E.2d at 147.

of Mother and Father.  The trial court's judgment was therefore not clearly erroneous.  We affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Boehm, and Rucker, JJ., concur.